**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

**TANYA WILDER**,

*Plaintiff*,

v.

**STATE FARM FIRE AND CASUALTY COMPANY**,

*Defendant*.

Case No. CIV-25-92-JD

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE/EXCLUDE PLAINTIFF'S EXPERT WITNESSES**

State Farm seeks to take advantage of its own dilatory conduct and brazenly asks this Court to strike Plaintiff's expert witnesses as a reward. State Farm's Motion to Strike (ECF No. 67) is a transparent attempt to exploit scheduling deadlines that it knows are the subject of Plaintiff's pending Motion to Extend Scheduling Order Deadlines, yet it seeks to exclude Plaintiff's four expert witnesses—not because of any deficiency in the substance of their expected testimony—but solely because Plaintiff has not yet served expert reports while a timely-filed Motion to Extend remains pending before this Court, the filing of which was prompted by ***State Farm's discovery misconduct***. Specifically, despite agreeing to consolidate Nicole Manduca's deposition across the numerous federal court cases in which she has been noticed, State Farm still has not produced Ms. Manduca for deposition. As this Court is well aware, Ms. Manduca's testimony is integral to Plaintiff's claims in this action, and in kind, material to Plaintiff's expert's testimony. Moreover, Plaintiff has also filed a Renewed Motion to Remand that remains pending. And, other judges in this district have granted extensions based on similar grounds as those raised here. As set forth below, Plaintiff's failure to serve expert reports was substantially justified by the circumstances of this case, is harmless, and exclusion would be an inappropriately severe sanction under the circumstances.[1]

**ARGUMENT**

Excluding expert testimony is a harsh and extreme remedy. *See, e.g., Gillum v.*

[1] *Box v. United States*, 2019 WL 6998754, at *1 (D. Kan. Dec. 20, 2019) ("The party who failed to make the required disclosure has the burden to demonstrate substantial justification or the lack of harm.").

*United States*, 309 F. App'x 267, 270 (10th Cir. 2009)(finding district court abused its discretion in striking expert testimony); *see also Box v. United States*, 2019 WL 6998754, at *2 (D. Kan. Dec. 20, 2019) ("striking an expert is an extreme measure."). "Rather, litigation should promote the finding of the truth, and, wherever possible, the resolution of cases on their merits." *Gillum, supra.* In weighing on whether to exclude expert testimony, the court should be guided by the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered, (2) the ability to cure any prejudice, (3) the potential for trial disruption if the testimony is allowed, and (4) the erring party's bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*., 170 F.3d 985, 993 (10th Cir. 1999); *see also Box, supra*.

## I. State Farm's Motion Should Be Denied Because Plaintiff's Motion to Extend Scheduling Order Deadlines Remains Pending.

Plaintiff filed her Motion to Extend Scheduling Order Deadlines, which demonstrated her diligence in alerting the Court to the need for additional time before the expert report deadline passed. The Motion set forth the reasons why Plaintiff could not meet the existing deadlines, thereby establishing "good cause" for the requested relief. *See* Fed. R. Civ. P. 16(b)(4); *Starr Indem. & Liab. Co. v. Pacific Air Holdings, LLC*, 2022 WL 20717534, at *1 (W.D. Okla. June 23, 2022). As noted by Plaintiff, this Court denied State Farm's Motion to Quash the deposition of Nicole Manduca, Team Leader of State Farm's FME Wind/Hail Initiative. *See Wiesman v. State Farm*, CIV-25-00050-JD, ECF No. 45 Order (W.D. Okla. April 3, 2026). Numerous other federal court cases in district have followed suit and ruled on similar motions, denying the same motion to quash by State

Farm, but ordering a consolidated federal deposition of Manduca. Despite being ordered to produce Ms. Manduca in a consolidated fashion, State Farm still has not produced her for deposition. The motion for extension remains pending, and the Court has not yet ruled on it. And while State Farm argues that a pending motion to extend neither tolls nor suspends an existing deadline, this argument ignores the broader equitable context: the Court retains discretion to modify its own scheduling orders, and it would be manifestly unjust to impose the ultimate sanction of expert exclusion while the Court has not yet addressed Plaintiff's diligent and timely request for relief, which is prompted in substantial part by State Farm's own refusal to provide relevant discovery. State Farm's Motion essentially asks this Court to deny Plaintiff's Motion to Extend by fiat through the back door of a preclusion sanction—without ever addressing the Motion to Extend on its merits.

## II. The Delay in Producing Expert Reports is Substantially Justified.

Under Rule 37(c)(1), exclusion is not warranted if the alleged failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). As stated *supra*, the Tenth Circuit has identified four factors for this analysis: (1) prejudice or surprise; (2) ability to cure; (3) disruption of trial; and (4) bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*., 170 F.3d 985, 993 (10th Cir. 1999). Each factor weighs in Plaintiff's favor.

### *A. No Cognizable Prejudice to State Farm*

State Farm claims it is prejudiced because it lacks notice of Plaintiff's experts' opinions, methodologies, and bases. However, this alleged "prejudice" is entirely curable by granting the pending Motion to Extend. Furthermore, any claimed prejudice is of State

Farm's own making: State Farm's deficient discovery responses and aggressive obstruction of the discovery process have directly impeded Plaintiff's ability to prepare expert reports. State Farm cannot create the conditions that prevent compliance with a deadline and then seek exclusion for that very noncompliance. Moreover, State Farm would not be unduly prejudiced by an extension because extensions have been granted in multiple other cases between counsel for both parties under identical circumstances, and much of the discovery and legal issues at issue stem from State Farm's failure to produce discovery and its own appeals of trial courts' rulings.

***B. The Prejudice Is Easily Cured***

State Farm argues that any prejudice cannot be cured, citing *Jacobsen v. Deseret Book Co*., 287 F.3d 936 (10th Cir. 2002). But *Jacobsen* involved experts who submitted incomplete reports and then sought to testify at trial to matters beyond those reports—a fundamentally different situation from this case, where no trial is imminent, the discovery process is still ongoing, and Plaintiff timely moved for an extension before the deadline expired. Here, the cure is straightforward: grant Plaintiff's Motion to Extend, allow Plaintiff to serve complete expert reports (pending the deposition of Nicole Manduca), allow State Farm its corresponding time for rebuttal reports and depositions, and adjust the remaining deadlines accordingly. This cure would preserve both parties' rights and promote the administration of justice on the merits.

***C. No Disruption of Trial***

This case is currently set on the December 2026 trial docket. To that end, State Farm argues that permitting late expert reports would disrupt the trial setting. However, the

December docket was set before the emergence of multiple significant developments, including: the Supreme Court's decision in *Hain*; other court's striking of scheduling orders in four parallel cases; the ongoing coordination of the consolidated Manduca deposition across multiple federal courts; and State Farm's continued failure to produce discovery. Critically, the trial date is not sacrosanct—particularly where, as here, the extension is necessitated by circumstances beyond Plaintiff's control. It is far more disruptive to the judicial system to try a case without expert testimony on the core issues of bad faith and damages than to adjust the trial date by a reasonable period.

### *D. Plaintiff Did Not Act in Bad Faith or Willfully*

State Farm's arbitrary characterization of Plaintiff's conduct as "willful" ignores the realities of the case. Plaintiff's inability to serve expert reports by May 22, 2026 was the direct result of: (1) State Farm's deficient and obstructive discovery responses, which deprived Plaintiff's experts of information necessary to prepare their reports; (2) other discovery (not Plaintiff's fault) not yet being completed as of the report deadline; and (3) the unique complexities of this multi-district State Farm litigation, including the ongoing coordination of Nicole Manduca's deposition. There is simply no evidence of bad faith. Plaintiff has been actively litigating this case, filing motions, participating in discovery, and prosecuting her claims diligently. The failure to serve expert reports was not intentional noncompliance—it was the unavoidable consequence of discovery that remains incomplete through no fault of Plaintiff's.

### *E. State Farm's Court Ordered Productions in Other Cases Shows State Farm's Lack of Good Faith Participation in Discovery in Plaintiff's case.*

To further demonstrate State Farm's abusive discovery practices, Plaintiff's counsel have received almost ***one million*** documents from State Farm pertaining to the Wind/Hail Focus Initiative and institutional practices at State Farm pertaining to the adjustment of wind/hail claims in two state court cases, but only after a litany of appeal briefing that included motions to reconsider and eventually a writ to the Oklahoma Supreme Court that State Farm lost. *See Hursh v. State Farm, et al.*, No. CJ-2025-2626 (Okla. Cnty. Dist. Ct.) (Palumbo, D.J.); *see also West v. State Farm, et al.*, No. CJ-2025-135 (Comanche Cnty. Dist. Ct.) (Sheperd, D.J.). The vast and extensive document productions ordered by Judge Palumbo and Judge Sheperd have led to notices of deposition for the State Farm CEO, Jon Farney, due to his knowledge of and/or involvement with the Wind/Hail Focus Initiative and the Fix Profit Task Force at the time of the Scheme's creation and implementation. After briefing State Farm's motion to quash the deposition of State Farm CEO Jon Farney, Judge Sheperd ordered that State Farm must present Jon Farney for deposition in September, subject to certain limitations. *See* **Exhibit 33**, *West v. State Farm*, No. CJ-2025-135 (Comanche Cnty. Dist. Ct.) (Order entered Aug. 14, 2026). In addition, Judge Sheperd also ordered that State Farm's blanket designation of all documents produced as confidential was stricken and found that numerous documents submitted by Plaintiff's counsel for the Court's consideration did not contain protected information and ordered those documents to be de-designated and removed from the *West* protective order, as well as to treat those documents like normal documents produced in discovery. *See* **Exhibit 32**, *West v. State Farm*, No. CJ-2025-135 (Comanche Cnty. Dist. Ct.) (Order entered Aug. 20, 2026).

Plaintiff now submits the documents produced by State Farm in *West* and de-designated as no longer confidential by Judge Sheperd in this case to not only show State Farm's unjust discovery practices, but to show ***why*** State Farm refuses to produce the documents requested by Plaintiff's counsel across all of their cases. *See* **Exhibits 1-31**; *see also* **Exhibit 32**, Sheperd Order De-Designating Exhibits. These documents are now a matter of public record and expose State Farm's insurance fraud on wind/hail claims due to the intentional targeting of full roof replacements as a way of saving indemnity dollars before those claims ever occurred, which is precisely what happened and is alleged in Plaintiff's case. These documents evidence an intentional Scheme by State Farm to reduce first party claims like Plaintiff's.

For example, Exhibit 1 pertains to an agent complaining to State Farm that, "Our claims processes need to be reviewed … as they are not working for the customer or the agent … Agents need to know who the appropriate leadership personnel are to make decisions. Right now – that is next to impossible. There appears to be zero accountability within the claims system." This exhibit also shows that Nicole Manduca was the Claim Manager on this claim, which caused the agent great chaos. *See* **Ex. 1**.

Additionally, Exhibit 2 shows that State Farm was focused on how they will "know the tactics are working" and these tactics were created in bad faith by State Farm leadership, including pillar leads Dana Jokerst, David Chikahisa, Eric Daly, and Nicole Manduca. *See* **Ex. 2**. Furthermore, State Farm identified that "Full Roof Replacements is [State Farm's] biggest bucket of opportunity[.]" **Ex. 3**. Furthermore, Nicole Manduca stated that the biggest bucket means indemnity savings. **Ex. 4** ("The hypothesis helped us see our biggest bucket

of opportunity (indemnity spend)"). State Farm's 2020 Fire Weather Leadership Business Plan identified that the "greatest opportunity" as "accounting for 57% of Net Paid Indemnity." **Ex. 5**.

State Farm bragged about saving "$1.4B[illion] decrease in indemnity" in just one year of the Scheme. **Ex. 6**. In fact, when Manduca confirmed that the FME Wind/Hail tactics worked so well for State Farm that ratios of full roof replacements to partial roof repairs were cut more than half in the years following introductions to all States. When Manduca asked if State Farm's results showed they were getting better, Tom Moss at State Farm bragged that "each % point difference is about 5k claim, so if we didn't pay for 1% of claims that did not have damage and were not covered but would have been paid for before based on lack of skill/will, that is 5K claims at $15,769 avg severity for $78.8 million." **Ex. 7**. So State Farm estimated that each homeowner they deny a roof replacement, like the Wiesman family, State Farm saves $15K on average. When State Farm leadership was discussing the wind/hail dashboard they created to track the roof tactics they developed, Kathy Ress told Manduca that this was a "[s]ilver platter for you." **Ex. 8**.

When State Farm leadership was discussing certain tactics, such as management reviews, roof skills reviews, Art of the Conversation to have tougher conversations when denying claims, Manduca noted "expanding/broadening management review on higher hail/wind severity threshold nets us the most gain from now until the end of the year." **Ex. 9**. State Farm worked with Accenture Consulting Services to develop self-serving and false industry standards that State Farm was overpaying on wind and hail claims. **Ex. 10**. This same email thread shows State Farm tracking reduction of total roof replacements. **Ex. 10**.

Manduca bragged about the "playbook" they created with the wind and hail tactics created to reduce coverage. **Ex. 11**. Manduca and Scott Welsh discussed the "huddle" they would do with the "playbook" on tactics they created. **Ex. 12**. John Christensen told Moss in 2023, "I want to ensure they plays that worked in the past we are doing." **Ex. 13**. This evidences that contrary to State Farm's claims, State Farm leadership in 2023 was doubling down on the tactics that saved State Farm $1.4 billion in 2021. **Ex. 13**; **Ex. 6**. Furthermore, John Christensen asked for "help on how we act immediately to improve our accuracy on wind/hail and the T[eam] M[anager] role" to "go back to what worked in the past to quickly make an impact." **Ex. 13**.

Jordan Coad emailed Manduca and other State Farm leadership about the Fix Profit Task Force ("Profit Task Force") and stated that the Profit Task Force was focused on "how we plan to continue to build on our momentum" and "continue focus on coverage for Water, Wind, and Hail." **Ex. 14**. Further down in the same chain, Jon Farney (current State Farm CEO) sent an email stating that State Farm was repurposing the Profit Task Force meeting to "discuss claims" and meet every Tuesday at 7 am. **Ex. 14**. Above this and in response to Farney, Michael Roper stated that some of the "Summary Observations" to discuss at the Profit Task Force Meeting on claims was that the "Property Damage C[losed] W[ithout] P[ayment] ratio was 39%, directly in line with estimates." **Ex. 14**. Roper also noted that the "tentative approach for Tuesday is to briefly cover the November trends at a high level before spending the majority of time focusing on Claims specific content." **Ex. 14**.

State Farm knew its tactics were implemented in bad faith, as evidenced by their leadership recommending that "any reference to 'targets' need replaced with 'selection'" **Ex.**

**15**. Manduca noted to State Farm leadership that the "Profit Task Force meetings are not anything we've typically been involved in, at least I don't think so." **Ex. 16**. This is likely because Oklahoma law has long established that an insurance company's claim center can never operate as a profit center, yet State Farm knew that agents and consumers were complaining "State Farm is not writing accurate estimates as we are writing to repair roofs instead of replacing them." **Ex. 17**.

Corporate discovery against State Farm cannot be separated from the individual discovery against the captive agent in each of these cases. For example, on October 5, 2021, a captive State Farm agent named Tracy Haus emailed Jon Farney and other State Farm leadership about how the tactics State Farm created to reduce roof coverage was impacting her and the State Farm insureds she served:

> **The old slogan of "we pay what we owe, not a penny less, not a penny more" is not the case right now. We now pay really low and customers fight to get what we owe them in more and more cases. In my 20 years I have NEVER had to worry about the reputation of State Farm.** Even when we have raised rates and been uncompetitive, I always knew even if customers were paying more to be with us, we would come through at claim time! #ClaimTimeIsGameTime. I have heard for years now about Allstate's declining reputation when it comes to claims. I have taken so many of their customers all while paying more to be with us in most cases. **I know I am not the first to send an email about the issues we are having in claims, I certainly hope you are receiving A LOT of communication from agents letting you know what's happening to our company from the ground. I have been involved in many agent discussions, email groups etc. about fire claims problems, and specially Roofing issues. I had faith that you all were handling it and that you knew by word of sales leaders and claims team managers that are on the ground that its really bad.** But when I heard the slogan from a very reputable roofing company owner, "You are not in good hands and we are not your good neighbor' ...I was very upset. **That's the slogan around the country, not just here in Louisville. He sent me screen shot after screen shot of reputable companies that for years have loved working with us and now say we are just as bad as Allstate.**

> **And if we choose to ignore the contractors then we must listen to our clients. Calls have increased, almost every roofing claim we have the customer is unhappy, the process is laborious, and 8/10 times we end up paying what we should have in the beginning but end up with a mad customer and a tarnished reputation. My team is spending more and more time on claims and being pulled away from selling. For the last 6 months the roofing claim problems have grown.**
>
> …
>
> **[W]hat is being done to look at and hopefully change the way Roofing claims are being handled?** This system is not only broken it is taking us down quicker than you can imagine. **Its gone from bad to worse in record time.** Word of mouth travels far and right now body shops to rental car companies to contractors are screaming from the rooftops and not saying nice things. Right now, our adjustors (4 in Louisville) are not the problem they are the solution. Roofing contractors would say we have a great team. **Inspectors are being sent out to measure and photo roofs and hand out a very small estimate to REPAIR knowing that in a lot of cases it should be much more than that. They are afraid to get their hand slapped and are in the pockets of State Farm so they are low balling at best and almost NEVER replace a roof.**

**Ex. 17**. What did State Farm leadership do after receiving hundreds of complaints just like this? Doubled down on the tactics causing chaos on wind and hail claims across the country. **Ex. 14**.

State Farm had many discussions about the "larger than normal number of complains" about coverage declining at State Farm and noted "[t]he roof thing is a problem. We have not done ourselves a favor there and claims leadership needs to clearly communicate the philosophy change to agents." **Ex. 18**. State Farm leadership specifically provided "Wind and Hail Claim Handling" training in a presentation to "Agency Leadership" in 2021, evidencing that these captive agents know they are selling illusory coverage that will not provide the full replacement cost benefits they purport to sell. **Ex. 19**. In fact, leadership such as Manduca were involved in calling agents about complaints

over roof claim handling specifically. *See* **Ex. 20**; *see also* **Ex. 21** ("I am saddened to share the impact that my agency is having over roof claims.").

Not only did State Farm leadership discuss claims specific content with agents, State Farm noted as early as 2020 that agents were distrustful of State Farm claim handling due to the massive changes in claim handling without any changes to the policy. **Ex. 22** ("Our 2020 Fire Claims quality plans also … disrupted expectations of our agents … this created a distrust of agents in our claim handling."). State Farm noted that the agents want to learn more about "underwriting guidelines, new processes being implemented and existing processes that are important for agents and customers to understand." **Ex. 22**. State Farm also noted it planned to "schedule Wind/Hail Quality discussions with Agency leadership." **Ex. 22**.

State Farm noted in 2021 that their tactics to reduce coverage were "going well" and the "Art of the Conversation" they created to help agents explain reduction of coverage without any new exclusions to the policy. **Ex. 23**. State Farm also scheduled a call in 2020 with all Oklahoma captive State Farm agents to discuss "damaging hail that impacted Oklahoma on April 21-22, 2020." **Ex. 24**. Another tactic State Farm developed was using a hidden definition from Haag Engineering on what is damage on a roof, discussing water-shedding ability, but did not add this language to their policy, and this was implemented in Texas and Oklahoma first. **Ex. 25**. For example, State Farm's operational guidelines on Wind/Hail provides that "damage occurs to roof coverings when water shedding ability or

the life expectancy of the material is reduced."[2] **Ex. 26**.

State Farm made the Haag Education Hail and Wind Assessment Video Series mandatory viewing and required "[a] yearly refresher of relevant portions from the HAAG Education Hail and Wind Assessment Video series .. [a] minimum of 2 hours of refresher training will be completed by each claim handler and T[eam] M[anager]." **Ex. 27**. They tracked the completion of Haag education video training of all their claim handlers through an internal software called "MyBlock." **Ex. 28**. Moss sent an email in 2022, noting that State Farm leadership had developed a "replace calculator" which was a "new tool" for State Farm to use, despite not telling insureds this was going to be implanted on their claims. **Ex. 29**. State Farm required mandatory training from Haag engineers despite having an internal moratorium on the use of Haag engineers in Oklahoma based on previously revealed fraud with respect to these Haag reports.

State Farm noted "Prioritized Tactics" which included "Early Team Manager Involvement" and these tactics were started at the "Wind/Hail Kick Off in Dallas County, TX June 26, 2020" and then "Expansion to Texas December 7, 2020" and "Expansion to all States December 17, 2020." **Ex. 30**. It also discusses the "Wind/Hail Playbook" wherein State Farm discussed the key tactics to reduce claim payments on wind and hail claims, namely: (1) Roof Skills Review, (2) HAAG Refresher, (3) Wind Loss Overview, (4) Art of the Conversation, (5) T[eam] M[anager] reviews on roof replacement recommendations

---

[2] Haag brags on its website that "A longstanding definition of functional damage used by Haag is a reduction in the water-shedding capability or expected service life of the roofing material." https://haagglobal.com/articles/september-2019-blog-post/ (last visited August 21, 2026).

but no review of roof denials, (6) Weekly Monitoring & Surveying of roof replacement recommendations and overturns. **Ex. 30**. It also showed a reduction in claim payments being tracked from February 2021 to June 2021. **Ex. 30**. State Farm even developed charts to show a reduction in total roof replacement to partial roof with their manager review overturns. **Ex. 30**. State Farm even developed a "Hail Reconciliation Unit" to overturn total roof replacement recommendations and track those reductions in coverage. **Ex. 31**.

The documents shown herein and attached to this response are precisely the type of documents crucial to the heart of Plaintiff's claims but have been withheld by State Farm so far despite Plaintiff's discovery requests for same. State Farm has provided Plaintiff with a severely limited document production that is mostly limited to the claim file – hundreds of documents compared to the near millions of documents produced in *West* and *Hursh*. This level of withholding documents is unjust to Plaintiff and the prosecution of her case and prevents Plaintiff's experts from being able to prepare full and accurate reports regarding State Farm's pattern and practice of bad faith conduct. State Farm must not be rewarded for such practices, and justice requires the relief requested in State Farm's Motion to be denied entirely.

## III. A Renewed Jurisdictional Challenge is Pending.

Plaintiff has also filed a Renewed Motion to Remand (ECF No. 52) following the Supreme Court's decision in *Hain Celestial Grp., Inc. v. Palmquist*, 607 U.S. 421 (2026), which represents a significant shift in fraudulent joinder jurisprudence and may affect this Court's jurisdiction. As this Court itself has recognized, and is undisputed, "the existence of subject-matter jurisdiction is a threshold inquiry which must precede any merits-based

determination. This requirement is 'inflexible and without exception.' " *Olsen v. Aebersold*, 71 F. App'x 7, 9 (10th Cir. 2003) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998)). As stated therein, good grounds exist for remanding this matter to state court. *See* ECF Nos. 52 & 60. Accordingly, subject matter jurisdiction should be adjudicated before any other substantive ruling.

## IV. Exclusion of Expert Testimony is an Extreme Request.

As stated above, the Tenth Circuit has recognized that exclusion of expert testimony is a harsh sanction that effectively prevents a party from presenting its case. Here, excluding Plaintiff's four expert witnesses would effectively deprive Plaintiff of the ability to prove her claims for bad faith and damages—claims that go to the heart of this case. This Court should not impose what amounts to a case-dispositive sanction based solely on a scheduling dispute where a Motion to Extend remains pending.

## V. Other Courts in This District Have Extended Deadlines Under Identical Circumstances.

This Court should follow the decision-making of Judge Heaton, who recently struck the Scheduling Orders in four of his State Farm cases following oral argument. Specifically, in *Dressel v. State Farm*, No. CIV-2025-860; *Johnson v. State Farm*, No. CIV-2025-1000; *Stafford v. State Farm*, No. CIV-2025-008; and *White v. State Farm*, No. CIV-25-561, Judge Heaton struck the scheduling orders and directed the parties to file a joint motion for entry of an amended scheduling order "when applicable." *See Stafford*, ECF No. 89 Order (May 27, 2026) (consolidating and granting the described relief in the aforementioned cases in the same litigation posture as here). Judge Heaton specifically

recognized that this litigation is unique, especially considering the requests among various different federal cases to consolidate certain discovery provisions. Judge Heaton advised that the consolidated Manduca deposition should take place only after production of documents and that any other scheduling deadlines should be stayed until such deposition and further discovery as necessary. Indeed, this Court recognized that State Farm's attempts to prevent Plaintiff from deposing high-level personnel, including Manduca, were unjustified. *See Wiesman*, ECF No. 45 Order (W.D. Okla. April 3, 2026). Accordingly, the Court should follow Judge Heaton's rationale and grant the requested extension.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion to Strike/Exclude Plaintiff's Expert Witnesses in its entirety.

Respectfully submitted,

*s/ Jake Denne*
Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office: 405.516.7800
Facsimile: 405.516.7859
*rwhitten@whittenburragelaw.com*
*mburrage@whittenburragelaw.com*
*bsonne@whittenburragelaw.com*
*hwhitten@whittenburragelaw.com*
*jsanders@whittenburragelaw.com*
*jdenne@whittenburragelaw.com*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send email notification of such filing to all registered parties.

*s/ Jake Denne*